**LOCKE DISTRIBUTING COMPANY, a Corporation, Plaintiff-Respondent,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, a Corporation, Defendant-Appellant.**

No. 32260,

St. Louis Court of Appeals.

Missouri.

Sept. 20, 1966.

Motion for Rehearing or to Transfer to Supreme Court Denied
Oct. 19, 1966.

Rader & Grimm, William S. Rader, Stanley A. Grimm, Cape Girardeau, for defendant-appellant.

Finch, Finch, Knehans & Cochrane, Jack O. Knehans, Marvin E. Wright, Cape Girardau, for plaintiff-respondent.

ANDERSON, Judge.

This is a suit on a bond issued by defendant, Hartford Accident and Indemnity Company, to plaintiff, Locke Distributing Company. By its terms, defendant agreed to indemnify plaintiff subject to certain conditions and limitations against loss of money or other property through any fraudulent or dishonest acts of any of plaintiff's employees to an amount not to exceed $10,-000.00. Recovery was sought for a loss alleged to have been sustained by plaintiff through the dishonest acts of two of its employees, namely, Helen Baker and her husband, Gene Baker. The prayer of the petition was for $10,000.00 with interest from March 1, 1963, together with a ten percent penalty and an attorney's fee of $2500.00 for vexatious refusal to pay under Section 375.420, RSMo 1959, V.A.M.S. The trial resulted in a verdict for the principal sum of $10,000.00, interest of $900.00 and an attorney's fee in the amount of $1,500.-00. No penalty was assessed. From the judgment on this verdict, defendant has appealed.

The insuring clause of the bond reads as follows:

"The Underwriter, in consideration of the payment of the premium, and subject to the Declarations made a part hereof, the General Agreements, Conditions and Limitations, and other terms of this Bond, agrees to indemnify the Insured against any loss of money or other property which the Insured shall sustain through any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others, to an amount not exceeding in the aggregate the amount stated in Item 3 of the Declarations."

The limits of liability stated in Item 3 of the Declarations was $10,000.00.

The only condition and limitation material on this appeal appears under the heading "Exclusion" and is as follows:

"SECTION 2. This Bond does not apply to loss, or to that part of any loss, as the case may be, the proof of which, either as to its factual existence or as to its amount, is dependent upon an inventory computation or a profit and loss computation; provided, however, that this paragraph shall not apply to loss of money or other property which the Insured can prove, through evidence wholly apart from such computations, is sustained by the Insured through any fraudulent or dishonest act or acts committed by any one or more of the Employees."

The bond was obtained through Fred Springer of Popp and Springer Insurance Brokers in Cape Girardeau. This firm represents five or six insurance companies, including Hartford Accident and Indemnity Company, defendant herein. It is also engaged in the real estate business. The bond sued on was not signed by this firm or any of its members. It was in full force and effect during the time plaintiff suffered the alleged losses for which plaintiff seeks recovery in this action.

Locke Distributing Company is a wholesale distributor of Falstaff Beer in eleven counties in southeast Missouri. Its main office and warehouse is located in Cape Girardeau. Branch offices and warehouses are maintained in Miner, in Kennett and in Poplar Bluff. Harold W. Locke is president of the Company and his son, Harold W. Locke, Jr., is its vice-president. Harold W. Locke is primarily the general manager of the Company's various offices and warehouses.

Helen Baker and her husband, Charles E. (Gene) Baker were employed to operate the business at the Poplar Bluff office and warehouse from 1959 to February 12, 1963. Helen was employed as a bookkeeper in the Company's office and her husband, Gene, performed duties as a salesman operating out of the Poplar Bluff warehouse. His duties were to load a truck each day with cases and packages of beer and call on licensed retailers of beer such as owners of

taverns and package stores. Each day he had a separate run or territory. Before starting on his route, he would fill out a "daily truck sheet," showing the number of export cases, quarts, seven ounce and cans loaded onto the truck. When making a sale, a sales ticket was filled in, showing the name of the person to whom the beer was delivered, the customer's license number, the date of the sale, the amount of beer delivered, and whether it was a cash or charge sale. If the sale was for cash, the ticket was marked "paid," but if credit was extended, the customer was supposed to sign the ticket. These tickets were contained in a book and were in triplicate, i. e. an original and two carbon copies. The practice was to send the first copy to plaintiff's Cape Girardeau office, the second copy was left with the purchaser; the third copy remained in the Poplar Bluff office. Each book contained fifty sets of tickets numbered serially. The salesman, at the end of his day's run, would turn in the used tickets together with the checks received and cash collected from customers to the bookkeeper at the Poplar Bluff plant.

Helen Baker was office manager and bookkeeper at Poplar Bluff. Her duties consisted in making a daily report, an original and carbon copy, showing the number of cases or packages of beer sold the previous day, whether for cash or on credit, the number of empties picked up, and the amount of money collected and deposited in the bank as a result of the day's operation. She made deposits in the bank of Poplar Bluff of the money and checks received, filling out at that time deposit slips in duplicate. All deposits were in the account of Locke Distributing Company. A copy of the deposit slip was sent to the Cape Girardeau office each day. The original daily report was also sent to the Cape Girardeau office and the carbon copy remained in the Poplar Bluff office. Each month, statements were sent direct from the bank to the Cape Girardeau office. Mrs. Baker would enter the charges and credits in an accounts receivable ledger, showing the

name of the purchaser, the name of the town where purchaser operated, the date of sale, the serial number of the sale ticket, and the total charge. Any empties which were picked up would be credited and the balance extended in the usual way.

In June 1960, Walter Buchheit, advertising and contact man for plaintiff in the Poplar Bluff territory, called Mr. Locke by telephone from Poplar Bluff and informed him there was not enough beer in the warehouse to operate the next day's run. The last warehouse stock report showed there was enough beer on hand there to operate several days. Nevertheless, Locke sent more beer to Poplar Bluff that day. Locke later received a stock report dated June 6, 1960, which indicated a shortage of a thousand and some packages, which according to Locke's testimony, would amount to a loss between three and five thousand dollars. This was not reported to the bonding company. After receiving the stock report, it was checked for clerical mistakes. Harold Locke, Jr., and Bob Harper then went to Poplar Bluff to make an inventory of the contents of the warehouse, and to check the reports. Locke testified that his reaction to the report of June 6, 1960, was that "there must be a mistake some place in the clerical work or accounting for that amount of beer being short. * * * I went over there and I talked to Helen Baker and Gene Baker in regard to this shortage. I tried to run their reports. They knew nothing about it. * * * She said she knew nothing about it and I said, 'This is a sizeable shortage.' She said 'Do you think we took it?' I said, 'No * * * I can't account for it, let's start checking the records.'" Mr. Locke further stated that at that time he tried to find whether there was a mistake by checking the stock reports, but was unable to locate a shortage. Thereafter Bob Harper, defendant's office manager at Cape Girardeau checked the inventory a number of times.

In August 1962, Fred Carr, of the C. P. A. firm of Hoche & Barklage, and Bob

Harper made a physical inventory of the contents of the Poplar Bluff warehouse. Over objection, Mr. Carr testified that he found approximately 190 cases of empty beer bottles surrounded by cases of full bottles. When Locke received this report, he again talked to the Bakers and tried to check the reports.

In January 1963, the deposit slips and reports from the Poplar Bluff office began arriving three or four days late. When this situation developed, Mr. Locke sent Bob Harper to Poplar Bluff to make a complete audit and to remain there until Mrs. Baker completed three delinquent reports. Harper was also sent back in February 1963, to do the same thing. His report to Mr. Locke on these two occasions was that there was an inventory shortage.

On February 12, 1963, Cecil Compton, Walter Buchheit, Harold Locke, Jr., and Harold Locke, Sr., met at Poplar Bluff. Compton was an advertising man and auditor employed by plaintiff. Buchheit was an advertising man employed by plaintiff. He was also referred to in the testimony as a contact man. They went to the plaintiff's warehouse, arriving there five or ten minutes before the Bakers. When the Bakers arrived, Mr. Locke told them to take a two weeks vacation, during which time Compton would take over the office, and Buchheit would assume Gene Baker's duties as route salesman. Locke asked for and the Bakers surrendered their keys to the warehouse and office.

Locke and his men then attempted to prepare a statement of the accounts and in doing so discovered that the accounts receivable ledger showed $132.00 owing from Raymond Eastwood. Eastwood had been out of business for three or four weeks, and Locke sent his son to see Eastwood to find out why the account had not been paid. Eastwood produced a cancelled check for the amount shown on the ledger to be owing, and a sales ticket marked "paid" by Gene Baker.

That same morning, Buchheit started out on the run he had taken over from Gene Baker. He was furnished a statement of the accounts of that run which had been prepared by Mr. Locke and Cecil Compton. He was to check the tickets and accounts which had been taken from the accounts receivable ledger. His first stop was at a place operated by one McCracken where he presented a ticket. McCracken informed him that the amount claimed to be due had been paid, and produced a ticket marked "paid." Buchheit reported this to Mr. Locke by telephone. Locke testified that about that time Helen Baker picked up the ledger and threw it down and said " 'Well you have me, * * * I owe all of this. * * * Well its. mine, I've taken it.' " This testimony went in over defendant's objection that it was hearsay.

Thereafter Buchheit called on thirty-nine other customers who had tickets marked "paid" which were, according to the company records, charge accounts. Each and every account on the ledger was checked. Mr. Joe Scholl, another employee of plaintiff, assisted Buchheit in this check. At the trial, Mr. Buchheit produced a list of the false accounts which he had found and it was stipulated that they amounted to a total of $3,796.50.

The evening of February 12, Locke returned to Cape Girardeau and called John Popp, of Popp and Springer, and told him of the shortage. Popp inquired as to how much the shortage was, and Locke replied, " 'John, I don't know at the present time, we are going to have to check each and every account and it will take me some time, what shall I do?' " Popp told him to go ahead and check the accounts and as he progressed with it, to report to him from time to time, and he would take care of it "like that."

On February 14, 1963, there was another meeting with the Bakers. Those present were Mr. Locke and Cecil Compton. On this occasion, the Bakers agreed to sign a confession. It was prepared by Mr. Locke,

and witnessed by Mr. Compton. Mr. Locke testified that the Bakers read the statement before they signed it. At the time, Helen Baker inquired if Mr. Locke was going to have them arrested and put in jail. Mr. Locke assured her he was not stating he had a bond and was going to report the matter to the bonding company. The statement was offered as plaintiff's Exhibit 8 by plaintiff and received in evidence over an objection that it was hearsay evidence, and the further objection that the Bakers were in court under subpoena and available to testify with reference to the matters disclosed therein. Said exhibit reads as follows:

"We Helen M. Baker and Chas. E. Baker employees of Locke Distributing Co. Poplar Bluff, Mo. admit to the following:

"Made false charge entries in accounts receivable ledger.

"Made false credit entries in A/C ledger.

"Have changed cash tickets to read as credit tickets. Have entered same in A/C ledger.

"Have used collections to cover shortages in stock.

"Have used company inventory to cover false charges.

"Have opened false charge accounts to cover inventory shortages.

"Have used funds from collected returned checks to cover false charges to customers and to help pay for merchandise shortage.

"We admit to all charges, shortages and inventory shortages attached to this statement and sign this statement of our own free will and without duress."

Locke testified that during the evening of February 14, 1963, he called Mr. Popp of Popp & Springer and told him about having secured the confession and read it to him. He stated that Mr. Popp asked how much he thought the shortage was going to run, to which he replied, "'I don't know, its getting sizeable. * * * we are not near finished. We are contacting each and every account and I think its going to run over $10,000.00, maybe more.'" Locke further testified that Popp replied, "'Well, the extent of your bond is $10,000 * * * I hope it don't run more than that.'" and told him to keep checking and when the final figure was ascertained they (Popp & Springer) would turn it over to the bonding company.

Fred C. Springer testified that about February 12, 1963, Mr. Locke called him on the telephone and told him that Helen Baker and Gene Baker had confessed to fraudulent and dishonest acts, and thought while in Mr. Locke's office he saw the confession which Mr. Locke had read to him over the telephone; that after that Mr. Locke conferred with him either personally or over the telephone almost daily for two or three weeks.

Locke further testified that from February 14 to February 22, they continued to audit the accounts, during which time additional shortages were discovered; that the Bakers, at his request, agreed to sign another confession which he prepared and which they signed. Cecil Compton who was present at the time signed as a witness. This statement was offered as plaintiff's Exhibit 9 by plaintiff and received in evidence over the objection that it was hearsay, and the further objection that the Bakers were in court under subpoena and available to testify with reference to the matters disclosed therein. Said exhibit reads as follows:

"Helen Baker and Chas. E. Baker make the following statement:

"We have just spent the money for our personal use and to help correct false tickets which we have made and etc. We admit that we have been short in our accounts and have taken money and stock

from Locke Dist. Co. Poplar Bluff, Mo. starting about the last part of 1959 to the first part of 1960.

"We have worked together evenings after the route was completed to change and make false tickets on customers.

"We kept no record as to our shortages. We took money as we needed it for our personal use—making false tickets —false charges—false entries in accounts receivable ledger to cover the stock and money which we used.

"In late 1959 or early 1960 when we first started using Locke Dist. Co. funds we thought it would be a temporary thing which we could pay back, but it kept on growing until the present time and we lost all knowledge of whose accounts we had changed and made false entries, false charges and false credits or when we made all of the above shortages and etc."

Locke testified that after obtaining the above confession, he talked to Fred Springer who told him, " 'Don't worry, your bond is good and you'll be paid. You can depend on $10,000.00. That is the limit of your bond. If it runs over that, I feel sorry for you, but you can depend on $10,000.00.' "

Gene Baker, while on the stand, admitted changing tickets from "paid" to "charge" stating he did this at Helen Baker's request. Helen Baker, who was also a witness, admitted making the false entries in the ledger.

Locke testified he hired the firm of Hoche & Barklage, Certified Public Accountants, to make an audit to determine the shortage at the Poplar Bluff office and warehouse. Fred Carr, of that firm, actually did the work. He was contacted in reference to this employment during the second week in February, 1963. Mr. Carr testified he would not call it an audit, but accounting work that would be a part of an audit; that he did not do an audit to the extent of verifying the records from an outside source which would be the normal course in making an audit. He stated he examined copies of invoice type delivery and pickup tickets used to indicate merchandise delivered to the Poplar Bluff warehouse and the merchandise picked up at said warehouse; that he worked from the daily stock reports, which he said could be characterized as a running inventory type of report. He also examined the bank statements to determine the amount of money that had been deposited, the general ledger, general journal, special journal and the general records of Locke Distributing Company. All these records were furnished him by Mr. Locke. The period covered was from January 1, 1960 to February 12, 1963.

On cross-examination, Mr. Carr testified that certain of the records were not properly prepared; that he could not vouch for the correctness of the daily stock reports or the correctness of the delivery slips showing merchandise delivered to the Poplar Bluff warehouse, or the sales slips (tickets) showing merchandise sold or the slips showing bottles returned to the warehouse; that he did not know if these records mentioned were initially correctly prepared, and that he had to assume they were prepared on the dates shown on them.

Mr. Carr prepared a summary of the results of the so-called audit, a copy of which was marked as plaintiff's Exhibit 15. The exhibit was offered and received in evidence over the strenuous objection of defendant's counsel. One of the objections was that Section 2 of the limitations of the bond, hereinbefore mentioned, rendered it immaterial and inadmissible. The exhibit showed an apparent shortage of $10,969.82. This consisted of an inventory shortage of $7,159.52, and an accounts receivable shortage of $3,796.50. Another shortage was in the sum of $100.00 being the amount of two returned checks. From the total of these items was deducted the sum of $86.25 being cash submitted to the Cape Girardeau office on February 19, 1963.

Mr. Locke testified that Mr. Carr was furnished with sales tickets, deposit slips,

daily reports, bank statements, cancelled checks, general ledgers, special ledgers and various records; that the matters furnished were books and records kept in a normal business manner in plaintiff's office and were a part of plaintiff's regular records and books; that they were copies or the originals sent by Mrs. Baker to plaintiff's office each day. However, plaintiff's counsel stated the books and records obviously were not true and correct, but were falsified. Locke further stated it was sometimes three or four days before he received the daily stock reports from Poplar Bluff, and that he did not know when they were prepared; that the only records he could verify as correct were those showing the amounts of money deposited in the bank, because the bank sent him bank statements each month; that a part of the time, the deposits were made a day or days after the money was received. He did not know how or when the Bakers prepared the records on which the audit was based.

Charles E. Worthington was claims manager for the defendant in Cape Girardeau. At sometime after the discovery of the shortage and after Mr. Carr had completed his audit, Mr. Worthington met with Mr. Locke in the office of Hoche and Barklage. The exact date of this meeting is not disclosed by the evidence. Mr. Carr and Mr. Hoche were present at this meeting. Mr. Locke presented Mr. Worthington with carbon copies of the two confessions signed by the Bakers, and copies of the list of fraudulent accounts uncovered. Mr. Carr and Mr. Hoche gave Mr. Worthington the final audits made by Mr. Carr.

After this meeting and during the latter part of February 1963, Worthington went to Poplar Bluff and talked to the Bakers. At that time, he obtained a statement from the Bakers. This meeting was held in the office of the General Adjustment Bureau in Poplar Bluff. The statement, dated February 27, 1963, was in Gene Baker's handwriting, except for the final paragraph thereof, which was written by Helen Baker. It was introduced in evidence by plaintiff without any objection by defendant. Said statement is in words and figures as follows:

"This is a statement concerning a shortage at the Locke Dist. Warehouse in Poplar Bluff. I understand that I am not required to make this statement, but I will, with the full knowledge that this statement can be used against us.

"My name is Charles E. Baker, age 41. We live at 1024 Henry St. Poplar Bluff, Mo. We have two children living with us and my wife's mother. My wife's name is Helen, her age is 39. This statement is a joint statement of me and my wife being written by myself. We have been employed by Locke Dist. Myself 12 years and approx. 7 or 8 years for my wife. I am employed as Route Salesman and my wife as bookkeeper. My duties were to make deliveries and sell Beer Cash and Credit. I had same stops and customers week from week. What I loaded on truck wasn't counted or checked until recently when we counted Beer and kept Truck sheet. We had no idea of this beer shortage and can't explain it of being this much. We thought when we left old Warehouse our stock was in OK condition and now almost 2 years later at new Warehouse we came up with this shortage. At new Warehouse we had Beer checked by Cape employ every Month. My wife's duties were to take Daily Sales and report charges and credits along with cash sales and make daily deposits. We can't exactly recall when or why we started taking these tickets and changing from Cash to Credit or the opposite. We didn't make (sic) rec'd on Accounts when beer shortage was in warehouse. We made it up by falsely making cash tickets or credit. This shortage of stock we have no idea what caused it or how it came about. The trailors (sic) from Cape brought beer from Cape and St. Louis unloaded and left ticket of what they had delivered to us. We never checked this until recent-

ly. Sometimes my wife wasn't even in Warehouse when this transaction was made. We Are Not Accusing Anyone or Anything. We had 2 break ins after moving to New location on Hiway 67 South. This was reported both times to local authorities.

"We did not to the best of our knowledge sell beer for Cash and pocket the money it was returned to Locke Dist. to make up violations of older tickets. In some cases we would sell Beer to Customers for Cash then change it in local office to a Charge and send in to Cape office then use Money to clear some other ticket which was due or a violation. All the Money that we took and used for Ourselves is now on ledger. The Waitress that ran Arthur Eastwood place at Wappopello Lake her name is June owes that ticket and she told me Arthur had OK for her to buy beer on Credit and I sold her which she has promised to pay the rest of tickets we do not question. Arthur Eastwood Wappopello, Mo. #83017–84929 Total of $61.95. Also since checking trailor (sic) loads of beer coming into Warehouse we have found errors on tickets which were Changed.

"We owe:

"To bank of Poplar Bluff on House $4660.00 personal loan there $275.00. To State Bank on car $1537.22 61 Pontiac Starchief. Superior Loan on Refrigerator around $400. Public Loan $800. on furniture. A few years ago Bank of Poplar Bluff appraised House for $12000. since then we added room on enclosed Carport and added overhead Carport on driveway which should bring value of property higher.

"The above statement of 2¼ pages has been written by my hand and is a statement covering our activities with Locke Dist. Co. This statement is given freely and voluntary and is true and Correct to the best of our knowledge.

(Signed) Charles E. Baker

"I, Helen Baker have read the above statement of 2¼ pages written by my husband Charles E. Baker. This statement with most of my help is true and correct to the best of my knowledge.

(Signed) Helen Baker

Witness: (Signed) C. E. Worthington"

In April 1963, defendant employed the firm of Diggs & Anders to make an audit of the company's business at Poplar Bluff. The audit was made during the latter part of April or first part of May. Most of the work was done by Mr. Minkler of that firm. Mr. Anders assisted him in lining up the work and reviewing his papers. Anders also helped Minkler write his report. During the course of the work, plaintiff and Hoche & Barklage furnished all records, ledgers and work sheets that were requested of them. The result of the audit was the disclosure of shortages in the same amounts as found by Mr. Carr and reported in his summary hereinbefore described. A detailed report of this audit was sent to defendant June 27, 1963.

On July 23, 1963, Mr. Worthington sent the following letter to Mr. Locke:

"Dear Mr. Locke:

"This will confirm our telephone conversation of July 15, 1963.

"As I stated at that time, we will accept the accounts receivable shortage of $3796.50. The information submitted by you is not sufficient to prove the inventory shortage of $7159.57 is traceable to the dishonesty of Helen and Charles E. Baker. Before this amount can be considered, we need some proof it was caused by the dishonesty of the Baker's and did not arise from errors in bookkeeping or from some other common inventory errors.

"We should be furnished with the dates that physical inventories were taken and by whom. Did these physical inventories agree with the book inventory? What

has been your experience at your other locations with the correctness of book inventory compared to physical inventory? Are there normal inventory errors at all your locations?

"In addition, there is no indication the Bakers have been tied into the inventory shortage by specific dates and times. Upon receipt of this information, it will be given consideration in connection with the inventory loss.

"As stated previously with the information we now have, the only amount directly traceable to the dishonesty of Helen and Charles E. Baker is the varified accounts receivable shortage of $3796.50."

Helen Baker was called as a witness by plaintiff. On direct examination she testified as follows:

"Q. Now, Mrs. Baker throughout these statements (Plaintiff's Exhibits 8 & 9), you mentioned that you have used company inventory, and I won't go into all the details, but there are no amounts contained in either statement, I'll ask you if you will tell the jury, please, ma'am, the total amount that you and Mr. Baker appropriated in accordance with these two statements?

"A. Just what was on the ledger. * * Offhand, I don't know what it was. * * I didn't keep any records whatsoever."

At this point, plaintiff's counsel asked permission to cross-examine Mrs. Baker as a hostile witness claiming surprise and stating as grounds therefor that her testimony was inconsistent with that given by her in a deposition taken October 24, 1964, prior to the trial. This permission was granted by the Court.

Plaintiff's counsel then read to the witness the following questions from the deposition which he stated had been asked her by defendant's counsel, and her answers thereto: " 'Q. What would be your estimate of the amount of beer that you and

your husband took?' " Her answer was, " 'Well I imagine it was around over Ten Thousand with the money and all, I guess. Q. That you took that much? A. I imagine. * * * Q. * * * could you break down how much money you took from the accounts receivable? A. I believe it come to around forty-nine hundred or four thousand or five thousand, I mean or something like that. Q. Are you saying then that you took $5,000.00 worth of beer also? A. Well, I don't know. It all amounted up to over $10,000.00.' "

The witness admitted that the foregoing questions were asked and that she gave the above answers to said questions. But she explained, "Sir, what I went by was the inventory they took that was showed to us."

The transcript then reveals the following:

"Q. * * * Now, do you remember this question being asked you? 'Now, are you saying $10,000.00 because you have been told that that was the amount of the shortage?' and your answer was 'No, nobody told me that.'

'Q. How did you come up with $10,000.00?

'A. Well, our first audit out there in April in the books, with the bonding company and ours both, showed that.

'Q. That is what somebody is telling you? A. No, sir, they are not. Q. (By Mr. Grimm) Well, I am asking you for your own recollection of how much you say that you took? A. Well, it is about ten thousand. Q. And on what are you basing that, Mrs. Baker? A. Well, over the period of years that the beer that was missing in stock, I imagine.' "

In answer to counsel's question, whether she remembered the foregoing questions and the answers given by her, the witness replied, "Yes, sir."

There then appears the following:

"Q. And now, Mrs. Baker * * * do you remember Mr. Grimm (Defendant's

Counsel) asking you this question? 'Have you understood the questions that I have asked you, or have I changed them sufficiently so that you could understand them?' You answered, 'Yes, sir.' 'Q. Are there any answers that you have given that you would like to change at this time? * * * A. Not that I remember. Q. * * * Have all the answers that you have given been true and correct, to the best of your knowledge? A. * * Yes, sir.' "

The witness answered that she recalled the foregoing questions and answers.

Mrs. Baker at the trial was then asked the following questions:

"Q. All right. Now Mrs. Baker, I'll ask you again if you can tell this Court and jury the total amount that you and your husband appropriated during the time that you were working for Mr. Locke in dollars and cents?" The witness replied, "Well, I don't know."

On cross-examination, Mrs. Baker gave the following testimony:

"Q. Did your husband, to your knowledge, or did you, take any beer and sell it and not report it on the slips, these daily slips, that were sent to Cape Girardeau? A. Not that I remember. Q. In other words, you are saying that the only money that you took from Locke Distributing Company was the adjustment of the accounts receivable, is that correct? A. Yes, sir. * * * Q. * * * Do you have any knowledge of this loss other than what you have been told about it by Mr. Locke or Mr. Knehans or Mr. Rader or myself (Grimm) as to the amount of it? A. No, sir. We went through the books but I didn't see that whole amount whenever it was added up from the ledger. * * * Q. In your deposition that Mr. Knehans has previously read to you, you testified that the loss was over $10,000.00, where did you get this idea? A. Well, from the books or the original ones. Q. And who showed that to you?

A. Well, the bonding company had one and also Mr. Locke showed us that. That's the reason I said it was over ten. Q. But this was because of what had been shown to you and not what you knew yourself, is that correct? A. Yes, sir. * * * Q. Mrs. Baker, do you know how they arrived at this figure of $10,000.00 of your own knowledge? A. One thing, just what was on the ledger, the ticket that was altered on the ledger. Q. Do you know, of your own knowledge, how this figure was arrived at, other than these accounts receivable that we previously talked about? A. Through stock report, I imagine. Q. But you have no knowledge yourself, is that correct? A. Well, there was an audit of it. Q. I'm talking about your own knowledge of what you know about the figures? A. No, sir."

On redirect examination, Mrs. Baker testified as follows:

"Q. (By Mr. Knehans) That isn't what you told Mr. Grimm when your deposition was taken, that you were basing the $10,000.00 figure on any audit? You didn't tell him that then, did you? A. Well, I don't remember. Q. Well, to refresh your recollection, let me ask you again, page 34, do you recall Mr. Grimm's question? (Reading) 'Q. Are you saying that you took $5,000.00 worth of beer also? A. Well, I don't know. It all amounted up to over $10,000.00.' Then Mr. Grimm said, 'Now, are you saying $10,000.00 because you have been told that that was the amount of the shortage?' And your answer was, 'No, nobody told me that.' You remember those questions and answers? A. Yes, sir. Q. Were those answers that you gave correct? A. I hope they were."

On recross-examination, Mrs. Baker testified she did not help make the audit or check any of the figures on it. She then gave the following testimony:

"Q. Well, then, if you didn't prepare the audit and you didn't help get it, where in

the world did you get this $10,000.00 figure unless somebody told you that's what it was? A. What I was going by is that the first one was over $10,000.00. Q. But its what somebody told you on that audit, isn't it? A. Well, I think both of them had it. Q. Did you yourself prepare any figures or have any knowledge—? A. Me and Mr. Locke went through the books to see on our ledger who owed. Q. This is the accounts receivable? A. That's right. Q. Now, then, did you have anything else to do with any other part other than the accounts receivable? A. No. Q. And so that the only shortage that you know about is the accounts receivable shortage? A. In the ledger."

Before plaintiff's deposition was taken, Locke called Mrs. Baker and her husband and told them he would like to see them at the warehouse. They went to the warehouse in response to this request. Mr. Locke and his attorney were there when they arrived. Mr. Locke showed them an amount, and told them the bonding company was only allowing ten thousand but the audit showed more than ten thousand.

Mr. Baker, defendant's witness, testified that at this meeting they were told about this lawsuit, and that Mr. Knehans kept repeating that it (loss) was over ten thousand dollars, and " * * * he wondered if we couldn't testify to that, so that Mr. Locke could get his Ten Thousand Dollars * * * he said he would keep in touch with us and for us to think about it and he would see us later."

The transcript shows the following testimony given by Mr. Baker in cross-examination:

"Q. As a matter of fact, what I (Knehans) told you was, isn't this true, Mr. Baker, that the auditor employed by Hartford, as well as Mr. Locke's auditor, both computed the shortage at over Ten Thousand Dollars, isn't that what I told you? A. It might have been. Q. Now, I didn't ask you to testify to anything that was either false or that you didn't know, did I? A. You didn't just come out and say that I had to, but you asked me, you said, the best I understand it, that you kept repeating it, that we would have to, that you'd like for us to, to testify. Q. As a matter of fact, isn't this what I said, both to you and to Mrs. Baker, that, 'If you can arrive at the amount of what you two have taken, that's what we want you to testify to,' isn't that what I told you? A. Yes, you said that."

Beer was delivered to the Poplar Bluff warehouse in trailer trucks. The truck driver, when delivering a load of beer, carries with him a key to the warehouse. He is thus able to unlock the warehouse and leave the beer if no one else is present. Mr. Locke testified it was very seldom that Mrs. Baker, who worked five days a week, was not present to perform her duty to count the beer as it was taken off the truck. If the beer was delivered on Saturday, the truck driver could unlock the warehouse, leave the beer and make out a ticket. He further stated that on such occasions, " * * maybe Baker would come in, he might be on a delivery at the time, he works until Saturday noon, or did work until Saturday noon. * * *"

Gene Baker testified that the only shortage he participated in was the cash receipts from the beer tickets. He stated, " * * * I don't know what happened to the beer shortage, I don't think anyone else knows."

Defendant contends that the trial court erred in overruling its objection to the testimony of Fred Carr with reference to the results of his examination of defendant's books and records. The basis of the objection was that by the terms of the bond, such testimony was inadmissible because based upon an inventory computation.

■ It is clear from a review of Mr. Carr's testimony that the existence and amount of the beer shortage at the Poplar Bluff warehouse was ascertained by him by inventory computation. The bond spe-

cifically provides that the bond does not cover any loss, or part of a loss, proof of which either as to its factual existence or as to its amount is dependent upon an inventory computation. It therefore follows that neither Carr's audit nor testimony of the results of the audit, insofar as it related to the beer shortage was competent evidence to establish liability under the bond for such shortage, unless the points urged by plaintiff in support of the court's ruling have merit. We will next consider said points.

Plaintiff contends there was sufficient substantial evidence independent of inventory computation to establish the fact of loss of property through fraudulent and dishonest acts of the Bakers, which proof rendered admissible the inventory computations to establish the amount thereof. Plaintiff cites the case of Tri-Motors Sales, Inc. v. Travelers Indemnity Company, 19 Wis.2d 99, 119 N.W.2d 327. In that case the Wisconsin Supreme Court, in construing a provision identical with the one here in question, held that once a plaintiff (Insured) has proved by independent evidence that the employee did steal property, the prohibition against the use of inventory computations is rendered inoperative, and the amount of such loss may be proved by inventory computations. In reaching this result, the court first found that the wording of the proviso rendered the exclusionary provision ambiguous, then reached the result it did by application of the rule that all ambiguities should be resolved against the insurer. We cannot agree with the opinion for the reason we find no such ambiguity in said provision. The words "as to its amount" appearing in the absolute prohibition was clearly intended to be carried over into the proviso, to prohibit the use of inventory computation in proof of the amount of the loss even though there be independent evidence of the act of stealing. The only effect of the proviso is to render inventory computations admissible as corroborative evidence, after proof of the misappropriation and the amount there-

of by evidence independent of inventory computation.

█ In passing, we deem it appropriate to point out that there is no merit to plaintiff's contention that the fact of dishonest appropriation of beer was established by the confessions obtained from them by Mr. Locke (Plaintiff's Exhibits 8 & 9). The confessions were not admissible as original evidence to prove the issue of liability on the bond, and cannot be considered here as substantial evidence of the facts therein related in proof of the alleged defaults. The rule which excludes hearsay as evidence applies to written, as well as oral statements, 31A C.J.S. Evidence § 194, p. 547. Hussey v. Robison, Mo., 285 S. W.2d 603; State ex rel. Thompson v. Harris, 355 Mo. 176, 195 S.W.2d 645, 166 A. L.R. 1425.

Plaintiff is also in error in stating that both Mr. and Mrs. Baker, in their testimony at the trial, admitted the theft of beer. An examination of the transcript reveals that they only admitted taking money, the amount of which was established by proof independent of inventory computation, to be $3,796.52. Both denied stealing from the beer stock.

It is further contended that the testimony of Helen Baker, in the deposition used at the trial for impeachment purposes, constitutes sufficient evidence that the loss, including money and beer amounted to over $10,000.00. Obviously, this testimony cannot, when considered as a whole be held to be competent proof of the amount of the beer loss wholly apart from inventory computation.

██ While it is true that in said deposition, Mrs. Baker said she imagined and guessed that the total amount of the shortage was over $10,000.00, it is apparent that such knowledge and belief was based on what was revealed by the audits. This is made clear by the following question and answer read to her at the time from the deposition: " 'Q. How did you come up

with $10,000.00? A. Well, our first audit out there in April in the books, with the bonding company and ours both, showed that.'" Mrs. Baker was, in effect, merely testifying to the total amount shown in the audits, and giving testimony based upon unsworn statements of other persons. In making the audits, the beer shortage as well as the amount thereof, was arrived at by the process of inventory computation. Under the terms of the bond, a loss established in this manner, either as to its existence or amount, is beyond the coverage of the bond. It therefore follows that such audit or testimony of the results of such an audit is not competent evidence to establish the amount of liability under said bond. Furthermore a witness should not be permitted to testify to facts where his knowledge thereof is derived from unsworn statements of others. 31A C.J.S. Evidence § 200, p. 568; Lavender v. Kurn, 355 Mo. 168, 195 S.W.2d 460. Testimony based upon hearsay is inadmissible. St. Louis Union Trust Co. v. Little, 320 Mo. 1058, 10 S. W.2d 47.

In the alternative, plaintiff contends that defendant, by its acts and conduct, waived the exclusionary provision in question by putting plaintiff to considerable expense and difficulty in connection with inventory computation.

■ Plaintiff apparently is trying to invoke the doctrine announced in many insurance decisions in this state that where the insurer, in any negotiations or transactions with insured, after knowledge of facts which would work a forfeiture, requires the insured to do some act or acts, incurring trouble or expense, the right to insist upon a forfeiture will be deemed waived. It is doubtful that this doctrine has application to the case at bar, because the question here is not one of forfeiture but of coverage. One cannot create coverage by waiver or estoppel. Rowland v. Missouri State Life Ins. Co., Mo.App., 48 S.W.2d 31; Berry v. Massachusetts Bonding & Ins. Co., 203 Mo.App. 459, 221 S.W.

748; Fernan v. Prudential Ins. Co. of America, Mo.App., 162 S.W.2d 281; Shepard v. Metropolitan Life Ins. Co., 231 Mo. App. 148, 99 S.W.2d 144; Rosenberg v. General Accident Fire & Life Assur. Co., Mo.App., 246 S.W. 1009.

■ But assuming that since the policy covered loss of property as well as cash and merely restricted the method of proof which could be the subject of waiver, there is no basis for its application in the instant case. The evidence upon which plaintiff relies as establishing implied waiver relates to requests and acts after the claim was made and before suit and also certain acts after suit was filed. Those which occurred prior to the beginning of the action are as follows: (a) The request for information contained in the letter dated July 23, 1963, (Plaintiff's Exhibit 10, heretofore set out) sent to plaintiff by defendant's claims attorney. (b) Examination by defendant's auditors of plaintiff's books and records and work sheets of plaintiff's auditors, which material was made available to defendant's auditors by plaintiff's auditors. (c) Production by plaintiff at defendant's request, all of its receiving slips, books and records, general ledger, daily reports and ledger sheets. (d) Putting plaintiff to the trouble and expense of having its auditors meet with defendant's auditors at which meeting there was an examination of plaintiff's tickets, daily reports, bank statements, general and special ledger, books and records, as well as the computations of plaintiff's auditors.

The bond provides (Section 7) as follows:

\* \* \* \* \* \*

"Upon the Underwriters request, the Insured shall produce for the Underwriter's examination all pertinent records, at such reasonable times and places as the Underwriter shall designate, and shall cooperate with the Underwriter in all matters pertaining to loss or claims with respect thereto."

In making the above mentioned requests, defendant was exercising a right given it by the bond. Likewise, in complying with defendant's requests, plaintiff was performing a duty imposed upon it by the terms of the contract. The matter called for and produced was pertinent to the investigation of the claim and to a proper evaluation of it. Under such circumstance, no waiver or estoppel could arise with reference to the application of Section 2 of said bond, by reason of the above mentioned requests and acts of the defendant. To so hold would unduly burden an insurer in its investigations of claims, and in effect, deprive it of rights stipulated for under the bond, and the right to adequately prepare its defense against the theory plaintiff was asserting. Furthermore, there was no showing that at the time of the said acts and requests, defendant had knowledge that plaintiff intended to rely solely upon inventory computations in proof of its loss.

■ Plaintiff further contends that defendant is estopped from relying on Section 2 of the bond by a letter dated June 20, 1963, addressed by defendant's St. Louis claims manager to defendant's Cape Girardeau agent, which letter stated in part as follows: " * * * I would like to disabuse your mind of any thoughts that Mr. Worthington (Claims Attorney) or the Hartford had been delaying action in the handling of this claim. It was purely a case of two (2) concerns of CPA's not being able to agree on the amount of the loss involved." It is not shown that the contents of this letter were ever communicated to plaintiff, or that plaintiff's position was changed to its detriment by reason thereof. In our opinion, this communication between two employees of defendant made during the processing of plaintiff's claim, cannot be said to establish waiver of the provisions of Section 2 of the bond, or to estop defendant from relying on said provision.

■ Finally it is urged that defendant waived the provisions of Section 2 by certain acts after suit was filed. These are stated to be: "(1) After the filing of suit, the defendant submitted to plaintiff a set of twenty-six interrogatories, fourteen of which were directly concerned with inventory and inventory computations. (2) Defendant took the depositions of Locke, Carr and Hoche on two different days requiring five or six hours at substantial expense to plaintiff. Most of the questions propounded to Carr and to Hoche concerned inventory and their inventory computations."

Neither the interrogatories nor the depositions referred to appear in the transcript. They were not lodged in this court. In fact the transcript fails to show their introduction into evidence. But be that as it may, we do not believe the action of defendant in seeking information that might be helpful in its defense or lead to the discovery of such evidence, which procedures our code permits, should be considered evidence of waiver or estoppel.

■ In our opinion, there was no evidentiary basis for a finding of an implied waiver, as plaintiff contends. Nor was there a showing of any direct act in the nature of a waiver, or promise, indicating an intent to waive, based upon a consideration. To establish such a waiver where a substantial right is involved, both knowledge and consideration must be present. It is only where an implied waiver is relied upon which contains elements of estoppel that proof of consideration need not be shown. Fairbanks, Morse & Co. v. Baskett, 98 Mo.App. 53, 71 S.W. 1113.

Carr's testimony as to what his examination and audit revealed with reference to the beer shortage was not competent on proof of liability under the bond for the alleged beer loss. Mid-Continent Stores, Inc. v. Central Surety & Ins. Corp., Mo. App., 377 S.W.2d 567.

Complaint is made of Instructions 2 and 4. Instruction No. 2 was a verdict directing instruction, and Instruction No. 4

was on the measure of damages. Neither instruction is set out in the argument portion of appellant's brief as required by Civil Rule 83.05(a), V.A.M.R.

 Instruction No. 2 directed a verdict for plaintiff if the jury found, among other facts, that "plaintiff sustained a loss of money or other property through any fraudulent or dishonest act or acts of Helen Baker or Charles E. Baker while in the employ of plaintiff during said period." This instruction, while in the words of the bond, does not give the jury any guide to determine what are fraudulent acts or limit them to a consideration of matters actually covered by the bond, that is, the intentional appropriation of money and property to their own use. It might well be that the jury, unlearned in the law, might consider acts of mere negligence, such as failure to be present and check beer being unloaded by truck drivers on Saturday mornings and before working hours at the plant, as fraudulent acts. Mere negligence or carelessness will not be sufficient to impose liability under the bond. The language of the bond implies positive acts of wrongdoing of a dishonest nature. The instruction also permits consideration by them of shortages disclosed by inventory computations thus permitting recovery upon evidence which merely shows that property covered by the bond was missing. On account of the method of doing business, the proof of the inventory shortage was not sufficient basis for establishing the fact of recoverable loss due to fraudulent acts of the Bakers. Such a finding would rest on speculation and conjecture. Instruction No. 4 is erroneous for the same reason.

On retrial, both instructions can be more carefully drawn so as not to give the jury a roving commission to determine matters of law, which is properly the duty of the court.

 We find no merit in defendant's point that all of the testimony of witness Carr, pertaining to the results of his ex-amination of plaintiff's books and records, was inadmissible because said books and records were not identified as business records under The Uniform Business Records as Evidence Law (Sections 490.660 to 490.690, RSMo.1959, V.A.M.S.,) and for the reason they were not correctly and accurately prepared. The books and records were identified by Mr. Locke as those of the company kept in the normal operation of the business. It was admitted by plaintiff's counsel that some of the ledger entries were inaccurate because they had been falsified by Helen Baker. The same is true of the daily reports. It also appears that sales slips were falsified by Gene Baker to show a credit sale when cash was actually collected. The falsifications were with reference to money embezzled by the Bakers. Plaintiff is not relying upon the verity of items appearing in the books and records to effect a recovery, but has made use thereof, together with the testimony of Walter Buchheit concerning his check with the customers shown on the ledger, to prove the amount of money stolen by the Bakers. There is no contention that the list of customers shown was in any way falsified. The records, though inaccurate as to the amounts shown to be due did not render the testimony of Carr with reference to the results of his audit inadmissible in the proof of the money shortage. What we have said also applies to plaintiff's Exhibit 15. So much thereof as pertained to the money shortage was admissible. Linnell v. London & Lancashire Indemnity Co., 74 N.D. 379, 22 N.W.2d 203.

 Finally it is urged that the Court erred in submitting to the jury the issue of vexatious refusal to pay. We think it apparent that on the facts presented in the record, the court erred in this respect. We deem further discussion of the matter wholly unnecessary.

The judgment is reversed and the cause is remanded.

WOLFE, P. J., and RUDDY, J., concur.